### In re PASCAL.

(Supreme Court, Appellate Division, First Department. November 17, 1911.)

ATTORNEY AND CLIENT (§ 38*)—DISBARMENT—MISCONDUCT.

An attorney is shown to be an unfit person to be a member of the profession, calling for his disbarment, both by the fact that on his client, against whom B. had a claim, giving him a check payable to B. for the amount of the claim, with instructions to try and have the claim reduced, he forged B.'s name, deposited the check to his own account, using part of the proceeds for his own purposes, and restored the funds to his client on the latter finding out, on complaint of B. that he had not been paid, what had been done, in the meantime having made no serious efforts to settle the claim, and not having informed his client of what he had done, and by the fact that he advised a client, charged with a serious offense, and out on bail, to forfeit his bail, or, knowing that he intended to forfeit it, made no suggestion to the court of such intention.

[Ed. Note.—For other cases, see Attorney and Client, Dec. Dig. § 38.*]

In the matter of Isadore L. Pascal, an attorney, on charges of professional misconduct preferred against him by the Association of the Bar of the City of New York. Respondent disbarred.

See, also, 142 App. Div. 935, 127 N. Y. Supp. 1135.

Argued before INGRAHAM, P. J., and LAUGHLIN, CLARKE, SCOTT, and DOWLING, JJ.

---

Einar Chrystie (Charles O. Maas, of counsel), for petitioner.
Philip C. Samuels, for respondent.

INGRAHAM, P. J. The referee was quite right in his decision that the charges embraced in the original and supplemental petitions were both included in the charges against the respondent before the court, and that it was his duty to take the testimony in relation to these charges as consolidated, and report that testimony to the court.

There are two charges presented against the respondent: First, with having received a check drawn by one Blair to the order of one Bonynge, a stenographer, being the amount of a bill that Bonynge had presented for his services as a stenographer on the trial of an action in which Blair was the respondent's client, and subsequently having indorsed Bonynge's name to that check and deposited it in his own bank to his individual account, and with having appropriated some portion of that check to his own use; second, that he advised a person for whom he was acting as attorney, who was under indictment on a criminal charge and out on bail, to forfeit his bail, and not appear in court for trial when ordered. As to both these charges the referee has found the respondent guilty, and the testimony clearly justifies his conclusion.

The respondent was attorney for one Blair in an action in the Supreme Court that had been referred to a referee. On that reference Bonynge had acted as stenographer. The referee reported in favor of Blair, and Bonynge had presented his bill to the respondent for his services as stenographer, the charge being $721. The respondent took this bill to Blair, stated to him that the bill would have to be paid before the respondent could enter judgment on the referee's report, but that he considered the bill exorbitant. Blair told the respondent to try and get the bill reduced, and at the same time directed a clerk in his office to draw a check for the amount of the bill. The clerk asked to whose order the check should be drawn when Blair said that the respondent would tell him, whereupon the respondent gave the bill to the clerk who drew a check to the order of Bonynge for the amount. The respondent took the check and the bill, and stopped at Bonynge's office to see if he could obtain a reduction, but, Bonynge not being in, he went to his own office. He says he there for the first time noticed that the check was drawn to the order of Bonynge. He called up Blair, his client, but Blair had left his office. The respondent then had a conversation over the telephone with Blair's nephew. The respondent says he told this nephew that he had a check to the order of Bonynge, that Bonynge had refused to reduce his charges, and he did not know what to do with the check, whereupon young Mr. Blair said to put it through his bank, and give it back to Mr. Blair, from whom he had received it. This young Mr. Blair was called as a witness by the respondent, and at first testified positively that the respondent did not say anything about the person to whose order the check was drawn, but simply said he had a check for the amount, and asked what to do, and that he, young Mr. Blair, being in a hurry and about to leave the office, told him to put it through his bank or give it back to his uncle,

having no interest in it, and not thinking anything about it. On further examination he testified that he did have a recollection of the respondent saying something about the check being drawn to the order of Bonynge, but, without thinking particularly about what the effect of his advice would be, simply told him to put it through his bank, or give it back to his uncle. On further cross-examination, he returned to his first statement, saying that he did not know to whose order the check was drawn; but he expressly testified that he never directly or by implication advised the respondent to sign Bonynge's name to the check, and had no intention of suggesting any such an act.

The respondent had a bank account in the Nassau Bank. It was a very small account, and, so far as appears, during the period in question he never had over a few dollars to his credit. On the afternoon of the day on which he received the check he indorsed it with the name of the payee, and then with his own name, and took it around to the bank for deposit to his own credit. An inspection of the indorsement shows that he intentionally indorsed Bonynge's name in a disguised handwriting so that no one looking at the check would for a moment suppose that it was indorsed by the same person who wrote the respondent's name on the back of it. He says that he changed the handwriting in which the name of the payee was written, as he thought he would have trouble to get the bank to accept the check if it was thought he had indorsed Bonynge's name on the check, and he therefore made this indorsement with the avowed purpose of deceiving his own bank, and inducing the bank to accept it for deposit by simulating the handwriting of another person on the check, so that the bank would not suppose that both names had been written by the same person. When this check was presented to the bank for deposit, the receiving teller called the attention of the assistant cashier to the check and its indorsement, and the assistant cashier asked the respondent whether the indorsement on the check was O. K. or correct. This could only refer to the indorsement of the payee, as the bank well knew the indorsement of the respondent, its depositor, and to that inquiry the respondent answered in the affirmative, assuring the bank officials that the indorsement was correct, whereupon the bank accepted the check for deposit, and collected it from the bank upon which it was drawn. The respondent drew against the amount thus deposited to some extent, so this account was only good by reason of the deposit of this check from the time it was deposited on the 7th of June down to the 19th of June, when the respondent repaid the money to his client.

These facts are mostly conceded by the respondent, his only defense being that he assumed from this conversation over the telephone with his client's nephew, who had no interest in the litigation or the check itself, and no authority to give any directions in regard to it, that he had a right to indorse the payee's name on the check and collect the proceeds, a rather astounding proposition for a lawyer to advance when defending himself from such a charge as this. There can be no serious doubt but what this was a deliberate and intentional forgery. There could be no possible object of the respondent getting this

money into his own possession by cashing this check except to personally use the money. There is some evidence that at the time the check was deposited the respondent had actually overdrawn his bank account. He himself admits he had given checks to several persons which would result in overdrawing his account, but that he had requested these individuals to hold the checks a few days before presenting them. But he names but one such person to whom he had given such a check. That was a check for only $10, and the person to whom he gave it was not produced as a witness. The respondent's check book has been lost so he was not able to show just the condition of his bank account as it appeared on such book, and he had nothing but the records of the bank to indicate the nature of his account. But from the 7th to the 19th of June he made no serious efforts to settle the stenographer's account, made no payment on account, and he did not inform his client of the situation or offer to make any restitution. On the 18th of June Bonynge who was looking after the payment of his bill, and had been unable to collect it from the respondent, went to Blair, who was the party to the action, to collect it. Blair informed him that the bill had been paid, and on examining his check book ascertained that a check had been drawn to Bonynge's order for the amount. Bonynge then disclaimed having received the money, and Blair's bank was then telephoned to, and the reply came that the check had been indorsed in Bonynge's name and paid. The respondent was then called upon for an explanation, and he offered to return the money to Blair, which he did on the following day by giving to Blair a check for the amount. In order to make that check good, it was necessary for him to make a deposit which he succeeded in doing of $95. The respondent excuses these overdrafts by saying that he made some mistake in his bank account by which he supposed he had some $40 more in the bank than he actually had; but, even if that was true, the checks that he had given exceeded that amount, so that he used a portion of this check to pay the checks that he had drawn on his own bank. Shortly after this money was returned, the case was presented to the grand jury, who for some reason refused to indict after hearing all the parties, including the respondent himself. The refusal could only have been upon the ground that they were not satisfied that Bonynge's name had been written on the check with intent to defraud, as the fact that the respondent actually forged Bonynge's name is undisputed. The respondent's counsel before the referee seemed to rely principally upon the point that by this proceeding the respondent could not defraud his client, as the respondent's own bank was responsible to the client, and that we are only authorized to discipline an attorney for defrauding his client. But it was a distinct fraud on his client to use a check given for a particular purpose for his own purposes, and, when in order to accomplish that result he forges the name of the payee of the check, he certainly commits a serious offense against his client as well as against the bank with whom he deposits the forged instrument.

But the fact that an attorney commits such an offense in matters relating to his client's business, so that, although the client was de-

frauded in the first instance, the ultimate damage would result to a third party, is certainly no defense. There is no possible excuse for the respondent. He knew very well that he was doing an unlawful and improper act, as is shown by the fact of the two indorsements upon the back of the check and his own confession that he feared the bank would not accept the check on deposit, unless he wrote the name of the payee of the check in such a way as to deceive the officers of the bank into thinking that it was written by some one other than the respondent. As before stated, there could be no possible object in his depositing that check on the afternoon that he did except to use the money himself. He had not been able to make a settlement with Bonynge. The check was perfectly safe in the condition that it was. All he had to do was to hold it until he had made some arrangement with Bonynge, or, failing, had either delivered the check to Bonynge or given it back to Blair, his client. Nothing that his client's nephew could say would justify him in altering the check or treating it, as he says, as drawn to the order of a fictitious person. That certainly was not the intent with which the check was drawn, nor was it a fictitious person, but to a person presenting a claim against Blair, a person well known by both Blair and the respondent to be a claimant of the amount indicated by the check. The whole transaction shows such a lack of common honesty and integrity that it is conclusively established that the respondent is not a proper person to be a member of the profession.

The second charge also involves serious professional misconduct. The respondent represented a person charged with a serious crime who was indicted and whose case was on the calendar for trial. He had endeavored to get a postponement without success, and the court had ordered the trial to proceed. The client was out on bail, and his refusing to appear for trial would involve serious financial loss to his bail, and, if he succeeded in evading arrest, would seriously impede the administration of the criminal law. The witnesses whom the referee has believed stated that the first suggestion to default came from the respondent who assured the person charged that there could be no injury to his bail by keeping out of the way a short time until another judge was on the bench. The respondent says that the suggestion came from the person charged with the crime, and not from himself, and that he stated to the person charged that, if he determined to default, he must himself take the consequences, and not blame it on the respondent. The respondent's statement of the occurrence is entirely uncorroborated, and we have the testimony of three witnesses, the person charged with the crime, his wife, and a companion who was with them, and certainly no motive is apparent why these persons should perjure themselves to injure the respondent. But the respondent, according to his own story, knew that the person charged with the crime contemplated a failure to appear for trial when the trial had been directed, and he made no suggestion to the court of this intended default. It was conceded both by the prisoner and the respondent that the prisoner had no defense and would have to plead guilty when his case actually came to trial, and it is incredible that the prisoner himself

should have thought of making a default so as to enable him to postpone the trial until he was able to hear from his relatives in Switzerland from whom he hoped to obtain money to make restitution, while it might well be supposed that by this failure to appear the two or three days delay necessary to put the case over until the next term, and so get before another judge, could be accomplished.

There is no question but that this second offense was serious professional misconduct, and, taken with the first, conclusively sustains the conclusion that this respondent is an entirely unfit person to be a member of the profession, and he is therefore disbarred. All concur.